## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| KIMBERLEE KNIGHT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 11-CV-2071 |
| | ) | |
| ILLINOIS DEPARTMENT OF NATURAL | ) | |
| RESOURCES, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

This case is before the court for ruling on the Motion for Summary Judgment (#34) filed by Defendants, the Illinois Department of Natural Resources (DNR), Eric Bumgarner, Michele Cusumano, Rafael Gutierrez, Marc Miller, Duane Pitchford, and Charles Redpath. This court has carefully reviewed all of the arguments and documents provided by the parties. Following this careful and thorough review, Defendants' Motion for Summary Judgment (#34) is GRANTED.

This court agrees with the conclusion of the arbitrator who denied Plaintiff's grievance of her discharge from employment. After hearing the evidence presented at the arbitration hearing and thoroughly analyzing the evidence and arguments in a written decision, the arbitrator stated:

In sum, while I sympathize greatly with the effect that my

decision will have on the Grievant, she is responsible for this

predicament. She chose to take a simple parking dispute to a new

level. Her behavior reflected poorly on the department and cast serious

doubt on her judgment. From there, the Employer discovered that

many other aspects of her performance were questionable. The

Employer concluded, after a thorough investigation, that it had no

alternative but to sever her employment.

The arbitrator then concluded that there was just cause for Plaintiff's termination.

This court also concludes that the decision makers reasonably determined that

termination was warranted by Plaintiff's unprofessional conduct in escalating the parking

conflict when considered with Plaintiff's other misconduct, most of which she does not

deny. Therefore, this court concludes that there can be no genuine dispute of fact

regarding whether her discharge was based on discrimination, retaliation or in violation of

her constitutional rights. This court concludes that there is no genuine dispute of material

fact regarding any of Plaintiff's claims and Defendants are entitled to summary judgment.

FACTS[1]

Plaintiff was hired by DNR in 1987 as a conservation officer. DNR is an Illinois

administrative agency which is responsible for protecting natural and recreational

resources through the enforcement of state and federal law. DNR has several bureaus,

---

[1] The facts are taken from Defendant's Statement of Undisputed Facts, Plaintiff's Statement of Additional Material Facts and the voluminous documents filed by the parties, including deposition transcripts, transcripts from the arbitration hearing, and affidavits (including the affidavit of Defendant Gutierrez). This court has only included facts which are material to the issues in this case and are adequately supported by the record. This court has not included facts which are based solely on inadmissible hearsay or facts which are based on rumor, speculation and conjecture.

including the Office of Law Enforcement. The Law Enforcement Office is responsible for enforcing, through sworn officers, laws which regulate hunting, fishing, snowmobiling, boating, All-Terrain vehicles, forestry and the use of state and federal parks in Illinois. The Law Enforcement Office is a paramilitary organization which adheres to a chain of command.

On May 22, 2000, Plaintiff was in a meeting in which other officers in her district were present. At the meeting, Plaintiff was advised she was assigned to work a specific detail. Plaintiff disagreed with the work assignment because she wanted to work the early shift and a male officer wanted the late shift; neither officer was reassigned to work the shift they wanted. Plaintiff commented that she was being sexually discriminated against by Defendant Pitchford because he would not assign her the shift she preferred. Pitchford overheard the comment and requested that her claim of sexual harassment be investigated. It is undisputed that the sexual harassment claim made by Plaintiff against Pitchford was unfounded. On October 11, 2000, Plaintiff was suspended for 30 days. The disciplinary fact sheet states that she was disciplined for improper radio procedure, failure to follow instruction, personal business on state time, disobeying orders and out of uniform on duty time. The suspension was originally for 30 days, but was reduced to 10 days based on a grievance resolution. Pitchford was Plaintiff's supervisor for periods of time after this incident and gave Plaintiff good performance evaluations.[2]

---

[2] In her Statement of Additional Material Facts, Plaintiff stated that, prior to becoming a conservation officer in 1987, she was a conservation education representative for DNR. Pitchford

3

In 2008 and 2009, Plaintiff was assigned to Region 3 and reported to Sergeant Tony Norman. Norman reported to the Region 3 Commander, who was Captain Pitchford until he retired in December 2009. Pitchford reported to Defendant Redpath, who was Deputy Chief. Redpath reported to Defendant Gutierrez, the Director of the Office of Law Enforcement. Gutierrez reported to the Deputy Director of DNR, Beth Penisis, who reported to Defendant Miller, the Director of DNR. Defendant Bumgarner was a lieutenant in the Office of Law Enforcement.

On September 25, 2008, Plaintiff and another conservation police officer, Dale Warren, had a meeting with Pitchford to discuss their performance evaluations. Rob Wellum, the union steward, was also present. At the meeting, Plaintiff and Warren informed Pitchford that Bill Cottrell, a conservation police officer, was often seen at his farm in Danville, Illinois, when he was supposed to be working his assigned shift, which sometimes involved a DUI assignment involving federal grant funds. Pitchford asked Plaintiff and Warren to reduce their complaint to writing.[3] According to Plaintiff, there

---

was an officer for DNR. Plaintiff stated that Pitchford was pursuing a relationship with her and, on one occasion, she stood him up on a date. Plaintiff stated that Pitchford was upset and told her he would do everything within his power to make certain she did not become a conservation police officer. This court agrees with Defendants that these facts are immaterial because Plaintiff has offered no evidence that these ancient events had any bearing on Pitchford's actions. Obviously, Plaintiff did become a conservation police officer (approximately 27 years ago) and the record does not contain any evidence that Pitchford took any adverse actions against her during the lengthy period of time prior to the events of this case.

[3] Plaintiff included this fact in her Statement of Additional Material Facts. However, in her affidavit, she said that Pitchford did not ask her to reduce her complaint to writing. This court agrees with Defendants that Plaintiff's inconsistency is not material to the issues raised.

was no policy requiring an officer to reduce a complaint to writing when it involved a fellow officer. Plaintiff testified that, a few weeks later, Pitchford told her that her allegations were correct. Pitchford testified that neither Plaintiff nor Warren would submit a complaint in writing and he therefore believed that it was not important to them. Pitchford testified that he did check all of the officers' activity and, from what he recalled, Cottrell was one of the most productive officers on the DUI details.

Conservation police officers carry firearms as weapons while on duty and are assigned State-issued squad vehicles which they take to their homes when not in use. It is undisputed that conservation police officers are also issued State equipment, which is not to be used for personal matters. It is further undisputed that, while on duty, conservation police officers are to be respectful and conduct themselves in a professional manner.

Plaintiff lived in a house on the north side of the street in St. Joseph, Illinois. Plaintiff lived with her daughter and son. In 2008, her son was old enough to drive and had a vehicle. Plaintiff also had a personal vehicle. Parking was allowed on both sides of the street, and Plaintiff parked her state issued truck (DNR truck) on the street in front of her home. The truck was a 2000 pick-up truck with an extended cab with a full-sized bed that was clearly marked as a DNR vehicle. In the late summer or early fall of 2008, the Village restricted parking to one side of the street, the south side of the street. Tim and Tammy Parker and their family lived across the street from Plaintiff on the south side of the street. For a time, Plaintiff continued to park her DNR truck on the north side of the

street, even though parking was prohibited on that side of the street. Pitchford received a call from the Champaign County Sheriff's Department and was advised that Plaintiff was parked illegally in front of her house. Pitchford contacted Plaintiff by telephone and instructed her not to park in violation of the no parking signs. Plaintiff testified that, on October 15, 2008, she received a letter from the Village informing her that her DNR truck was parked illegally because it extended over the sidewalk while it was parked in her driveway. Plaintiff testified that her garage was full and her driveway was short and two vehicles parked one behind the other would not fit. There was room in her driveway for two vehicles parked side by side. Plaintiff started parking her DNR truck, legally, in front of the Parkers' home on the south side of the street. Plaintiff made attempts to get the Village board to lift the ban which prohibited parking on the north side of the street, but the board refused to do so. Plaintiff also gave the Parkers a key to her vehicle so they could move it if they needed to.

It is undisputed that the Parkers asked Plaintiff to move her DNR truck from the street in front of their home on several occasions. It is undisputed that the Parkers had a handicapped relative and wanted to have close parking in front of their house. It is also undisputed that many times when Plaintiff parked her DNR truck in front of the Parkers' residence, Plaintiff's driveway was empty. On November 3, 2008, Tammy Parker stuck a post-it note on the driver's side window of Plaintiff's DNR truck which stated "You need to park your truck somewhere else." After finding the note, Plaintiff contacted the

Champaign County Sheriff's Department. Plaintiff informed the deputy who responded to the call that the Parkers were continuously harassing her about her legally parked vehicle and left a note on her vehicle which she viewed as a threat.[4] Plaintiff asked the deputy to obtain the spare key to the DNR truck from the Parkers, which he did.

After this incident, Tammy Parker contacted Pitchford to complain about the DNR truck being parked in front of their residence. Pitchford told her that if the DNR truck was legally parked, he could not compel Plaintiff to remove the vehicle. Pitchford also said he would ask Plaintiff to be a good neighbor and move the vehicle. Pitchford testified that Tammy Parker "was asking for an open space to be left in front of her house" which seemed very simple to him. Pitchford stated that it "seemed like a small request and easily accommodated." Pitchford testified that he knew Plaintiff had a driveway and that the DNR truck could be parked in her driveway. Plaintiff testified that Pitchford called her and asked her to "take the high road." Plaintiff said that Pitchford told her to vary her parking and, when she could, to utilize her driveway. Plaintiff testified that she considered Pitchford's request to be an order and that she did utilize her driveway when she could.

During their conversation, Plaintiff told Pitchford that she had given the Parkers a

---

[4] Plaintiff testified that, prior to the incident with the note, her DNR truck had been "keyed down the entire side" and dog feces had been left in the bed of the truck. Plaintiff believed the Parkers were responsible. The Parkers denied vandalizing Plaintiff's DNR truck at any time. This court agrees with Defendants that this dispute is not material to the issues in this case because it is irrelevant to the discipline imposed.

key to her DNR truck so they could move the vehicle if needed. Pitchford had concerns about Plaintiff giving the key to the Parkers because members of the public were granted access to a DNR truck which could have firearms, state property, and evidence, and this was not allowed pursuant to DNR policy.

On January 2, 2009, Tim Parker called Pitchford again about the parking issue with Plaintiff. The Parkers testified that Plaintiff's DNR truck was parked in front of their house for a long period of time, including during the Christmas holidays. Pitchford told Tim Parker that he would speak with Plaintiff again, after she returned to work after her approved leave during the holidays.[5] Also on January 2, 2009, the Parkers typed up letters to the village of St. Joseph and the Crestwood Homeowners Association and attached some photos of Plaintiff's DNR truck parked on the street. Copies of the letters were sent to Pitchford.

On January 8, 2009, when Plaintiff returned to work, Pitchford called Plaintiff to discuss the parking issue again and asked her to "take the high road" and park in her driveway as much as she could. Plaintiff replied that the Parkers had "won." Plaintiff requested Pitchford's assistance in contacting St. Joseph village officials about the parking issue. Pitchford refused to get involved because it was "beyond the scope of [his] concern." On January 15, 2009, Plaintiff received an oral reprimand, the lowest form of progressive discipline, which had no repercussions. Plaintiff testified that she was orally

---

[5] Plaintiff has not disputed that she left her DNR truck in front of the Parkers' house during her leave.

reprimanded for giving the Parkers a key to the DNR truck.

On January 13, 2009, the Parkers attended a meeting of the village board. The village board voted to change the parking on the street from the south side to the north side. Tammy Parker testified that the change would not take effect until January 28, 2009. Tiffany McElroy-Smetzer, a village employee, let Plaintiff know about the change.

The evening of January 24, 2009, Plaintiff arrived at her residence in her DNR truck, and in uniform. Tim Parker's car was parked in front of the Parker residence. Plaintiff testified that she thought this was odd because, in the three years prior, they had never parked their vehicle on the street. Plaintiff then parked her DNR truck in front of Tim Parker's car. During her deposition, Plaintiff admitted that she did not obey Pitchford's order when she parked in front of the Parkers' home. Plaintiff testified that she saw Tim Parker enter his car and talk on his cell phone before speeding away. Although Plaintiff did not know where Tim Parker was going, he left to get a prescription for his son, who was ill. He had been on the phone with his wife, Tammy, about what pharmacy to use. Plaintiff wanted evidence of where she had parked in relation to where Tim Parker had been parked, so she took photographs on her state-issued camera. Tammy Parker came out of her house twice to ask Plaintiff what she was doing. Plaintiff gave no response the first time and, the second time, Plaintiff told Tammy Parker that she had contacted the Illinois State Police dispatchers who were recording what Parker was saying. Plaintiff testified that Tammy Parker "verbally accosted" her while she was taking

the pictures. Plaintiff testified that she called the Champaign County Sheriff's Office because she "just wanted them to explain I was legally parked." A sheriff's deputy arrived and took statements from Plaintiff and the Parkers about the parking dispute. He took no further action. On January 25, 2009, Tammy Parker emailed the village to request that the switch in the parking ban be moved up.

On the morning of January 26, 2009, Tim Parker drove to Casey's in St. Joseph and saw Plaintiff driving behind him. He testified that he thought Plaintiff was following him. Plaintiff came into Casey's after he did. When he left, Plaintiff's DNR truck was again behind him. He went to the St. Joseph village hall. Plaintiff drove past the St. Joseph village hall and, when she saw Tim Parker inside, called McElroy-Smetzer.

On January 26, 2009, the Parkers contacted Pitchford by telephone and in writing to inquire into whether DNR could intervene. Pitchford interviewed the Parkers on January 26, 2009, after being assigned the task by Director Gutierrez and/or Deputy Chief Redpath. Pitchford wrote the questions on a written form and the Parkers wrote their own responses to the questions.

A meeting was held with Plaintiff on January 26, 2009, and Plaintiff was placed on administrative leave with pay. At the meeting, Redpath informed Plaintiff that he and Bumgarner would be conducting the investigation. Redpath and Gutierrez were both aware of the sexual harassment complaint made by Plaintiff against Pitchford in 2000. Plaintiff was instructed "not to have any verbal or physical contact with [her] neighbors

Tim and Tammy Parker." Plaintiff relinquished her DNR truck, her service weapon and other items. Plaintiff testified that she called McElroy-Smetzer on January 27, 2009 and told her that this "whole mess has cost me my job." McElroy-Smetzer reported this phone call to Pitchford, who contacted Redpath. Redpath called Plaintiff and "instructed her not to contact anyone else, until further notice about anything to do with the investigation."

Pitchford, as Region 3 Commander, conducted the investigation. According to Gutierrez, when a serious policy violation involving a conservation police office is investigated and more than a counseling is being considered, the DNR Office of Law Enforcement has a policy that a region commander, rather than a first line supervisor, conducts the investigation. As part of the investigation, Pitchford reviewed surveillance video from Casey's and did not observe anything unusual between Tim Parker and Plaintiff. Pitchford also took a statement from McElroy-Smetzer. In her lengthy written statement, McElroy-Smetzer stated that she thought it was "creepy" when Plaintiff drove by the village office when Tim Parker was inside and that she thought it "was very strange & somewhat scary" when Plaintiff then called her.

On January 28, 2009, Pitchford looked in Plaintiff's DNR truck and found three pieces of tagged evidence that had been seized by Plaintiff and several blank laboratory reports. Plaintiff had failed to place her signature on the evidence tags to show the chain of custody. Conservation police officers are required to seize evidence of a violation, log the evidence and secure the evidence. Failure to properly log the evidence is considered a

serious violation. According to Pitchford, the time frame for taking evidence to the lab can vary depending on court practices for particular counties, but normal procedure is to have drugs tested within 60 days. DNR prohibits having drugs in a state vehicle more than 96 hours. On January 29, 2009, Pitchford transported the evidence to the district evidence facility and noted deficiencies in logging evidence. Plaintiff had been the evidence officer prior to her leave. Also on January 29, 2009, Pitchford, accompanied by Norman, retrieved Plaintiff's state-issued camera, which contained photographs of the area in front of the Parkers' house.

Plaintiff was notified on February 2, 2009, that she was to report for an investigatory hearing on February 6, 2009. Bumgarner conducted the investigatory interview after discussing with Gutierrez and Redpath what questions to ask Plaintiff. Shane Voyles, the attorney for the union which represented Plaintiff, Kevin Bettis, a union representative, Gutierrez and his secretary, Sharon Bell, were also present. Bell took the oral responses of Plaintiff in shorthand and then transcribed the shorthand to a typed document. Plaintiff stated that she took pictures on January 24, 2009, to obtain evidence of the Parkers' harassment to prohibit her from legally parking her DNR truck in front of their house. She described the harassment as the fact that "their unit was in my usual parking place." Plaintiff also stated that she asked the sheriff's deputy who arrived that night to "advise the Parkers that I was parking legally and for them to stop harassing me."

According to Gutierrez, although citizen complaints may be reported to any DNR employee, the complaint ultimately must be reported through the chain of command to Gutierrez and must be investigated. Gutierrez reviews all investigations of citizen complaints prior to the matter being closed. If the parking of an official DNR vehicle causes inconvenience to an officer's neighbors, it reflects negatively on the Department and is bad for public relations. DNR could not control where the Parkers parked their vehicles, but it could control where Plaintiff parked her official vehicle when off duty.

On February 20, 2009, Pitchford faxed Gutierrez two pages marked "confidential." The first page related to the 2000 sexual harassment claim. Gutierrez testified that, because of the length of time and the fact that the claim against Pitchford was unfounded, he saw no problem with Pitchford conducting the investigation. Gutierrez stated that his knowledge of Plaintiff's 2000 oral complaint had no bearing on his decision making process in determining what discipline to impose on Plaintiff.  The second page of the fax related to domestic disturbances at Plaintiff's home in 2002.

On February 23, 2009, Redpath provided Plaintiff with notification of a second investigatory interview regarding a report of a missing rifle and the evidence found in her DNR truck. On March 2, 2009, Redpath conducted the investigatory interview. Plaintiff said that she just forgot the evidence that was under the seat in her DNR truck. Plaintiff also said that she returned the rifle to its owner but did not complete the paperwork. Redpath informed Plaintiff that he would have her complete the paperwork relating to the

rifle issue when she returned to work.

On March 10, 2009, Plaintiff was sent for a fitness-for-duty examination with Dr. Paul Detrick because concerns existed about whether Plaintiff was making rational decisions while acting as a law enforcement officer and therefore whether she could competently perform as a law enforcement officer without posing a risk to others. Plaintiff's union did not object to the examination as long as DNR followed the union contract. Dr. Detrick prepared a report, dated March 10, 2009, which discussed the parking dispute and his evaluation of Plaintiff. Dr. Detrick concluded that, "[g]iven the unpredictable status of this conflict and the role the employee appears to be continuing to play in escalating the conflict[,] employee is not considered fit for unrestricted duty at the present time." Dr. Detrick suggested mediation of the dispute and stated that "[e]mployee may return to unrestricted duty when she and the mediator assess the conflict as having been resolved."

On April 29, 2009, a letter was sent to Plaintiff by Michele Cusumano, Director of the Office of Human Resources for DNR, regarding Dr. Detrick's report. Cusumano provided Plaintiff with a copy of the report and stated that DNR "does not have the authority to fund such mediation for personal, domestic situations that involve any of our employees." Cusumano stated that Plaintiff would not be allowed to return to unrestricted duty until a treatment provider deemed her fit for duty. Cusumano's letter also stated "I feel compelled to inform you that upon your return, you will be subject to discipline for

any and all outstanding issues with the Department."

On April 17, 2009, another conservation police officer needed to borrow the DNR truck which had been assigned to Plaintiff. A written warning and an unissued citation written on August 2, 2008, by conservation police officer Dale Warren were found in the truck. The evidence shows that Plaintiff agreed to attempt to serve and process the tickets for Warren in August 2008 but failed to serve the documents or return them to Warren.

Plaintiff and her union decided to have a second psychological examination conducted by her chosen mental health examiner. On April 28, 2009, this examiner determined that Plaintiff was fit for duty. On June 15, 2009, the examiner provided a form to DNR which stated that Plaintiff "is, and has been, fit for full duty as a law enforcement officer." Because there were two inconsistent examination results, Dr. Detrick's finding that Plaintiff was not fit for unrestricted duty and Plaintiff's examiner's finding that Plaintiff was fit for duty, the union contract provides for a third examination by an impartial physician. According to Gutierrez, the employee and the employer mutually agree on a third physician, and the employee is required to attend the scheduled examination. On July 20, 2009, a third mental health professional examined Plaintiff and determined that she could return to work with no restrictions.

Plaintiff returned to work on or about August 6, 2009. When Plaintiff was found by medical experts to be fit for duty, a determination was made to go forward on the discipline for misconduct, which had been suspended during the fitness for duty process.

Gutierrez stated in his affidavit that pursuing disciplinary charges against Plaintiff was deemed warranted as a result of the investigation.

Plaintiff was scheduled for a period of training after she returned to work and was not scheduled to pick up her DNR truck until August 20, 2009. On August 21, 2009, Plaintiff received the DNR truck and boxes containing equipment. On August 21, 2009, a sign was placed in Plaintiff's yard which said "It's Back" at the same time the DNR truck was returned to her house. Tammy Parker reported the sign to Pitchford. Pitchford took photographs of the sign and told Plaintiff to take it down.

After receiving equipment on August 21, 2009, Plaintiff was unable to locate her radio or her camera. On September 3, 2009, she was given another opportunity to go through the boxes of equipment she received on August 21, 2009. At that time, Plaintiff located her camera and portable radio. Also on September 3, 2009, Plaintiff was notified of an investigatory interview to be held on September 15, 2009. This related, in part, to the citations Plaintiff agreed to serve for Warren in August 2008 which were found by another officer on April 17, 2009. There is a policy which states that, if a conservation police officer cannot immediately locate the offender within five days, the conservation police officer should write a report indicating why the citation was not served. The citation is a court document with a control number for which there needs to be an accounting. The violator gets the citation, the clerk of the court gets a copy and the conservation police officer copy is sent to DNR headquarters. If a citation is voided

because it cannot be served, there needs to be a report made within five days indicating why it could not be served.

On September 6, 2009, Plaintiff attended a football game in Bismarck, Illinois, to watch her daughter cheer. She was in uniform and drove her DNR truck to the game.

On September 11, 2009, Plaintiff was scheduled for a random drug test to be administered by DNR Human Services representative, Sabrina Johnson. According to Johnson, Plaintiff told Johnson she "fucking hates" Gutierrez, Redpath, Bumgarner, Pitchford, Norman, and Cusumano. Plaintiff admitted making this statement about Gutierrez, Redpath, Pitchford and Cusumano, but denied saying that she hated Norman and Bumgarner, because she is friends with them.

On September 12, 2009, Plaintiff started work late by 30 minutes and promptly reported it to her immediate supervisor, Norman. Norman did not treat this as a disciplinary matter and testified that he had no problem with it because Plaintiff called him right away.

On September 14, 2009, Pitchford provided Plaintiff with a fourth notice of investigatory interview to occur on September 29, 2009, regarding the missing portable radio.

On September 15, 2009, Pitchford conducted the investigatory interview regarding the citations Plaintiff agreed to serve for Warren which were found in her DNR truck. Plaintiff stated that she failed to return them to Warren because she "forgot [she] had

them." Warren prepared a memo for Pitchford related to this incident. Warren confirmed that he asked Plaintiff if she could deliver the citation and warning but stated that he "should have kept track of it more closely."

On September 20, 2009, Plaintiff attended a football game in St. Joseph while in uniform. Patricia McKinney, a citizen who was also at the game, complained.

On September 21, 2009, Norman wrote a memo to Gutierrez regarding Plaintiff's late start for work on September 18, 2009. Norman wrote the memo at Gutierrez's request. In the memo, Norman stated that Plaintiff was scheduled to work at 8:00 a.m. that day but mistakenly assumed she was working the 2:00 p.m. to 11:00 p.m. shift. Plaintiff stated work at about 10:00 a.m.

On September 29, 2009, Pitchford conducted the investigatory interview regarding the missing portable radio and camera, as well as other matters. Plaintiff admitted that she was given an inventory log on or about August 20, 2009, which reflected that her issued portable radio and digital camera were present and accounted for. On August 21, 2009, she was given the entire workday to organize her issued equipment and spent the day sorting through 3 or 4 boxes. She was directed to search for the portable radio on September 3, 2009, and ultimately found the radio and her camera in a box in her garage. Plaintiff admitted that she did not contact Pitchford about the results of her search even though she was directed to do so. Plaintiff also explained that she did not need her portable radio during her training time.

An investigatory interview regarding the football game incidents was held on October 16, 2009. During the interview, Plaintiff admitted that, on September 6, 2009, she used her DNR truck to travel to Bismarck, while off-duty, and remained at the game for approximately 30 minutes after her assigned work shift started. Plaintiff also admitted leaving from and returning to a football game on September 20, 2009, to use her uniformed presence to intimidate McKinney, who Plaintiff said was taking pictures of her daughter. Plaintiff had previously issued citations to members of McKinney's family and believed that McKinney has a grudge against her.

On November 2, 2009, an investigatory interview was held regarding Plaintiff's statements to Sabrina Johnson at the time of her random drug test and the fact that she reported to work late on September 12 and 18, 2009.

Based upon the investigation of all of the charges against Plaintiff, Gutierrez believed that Plaintiff had engaged in misconduct which reflected that she was not exercising the judgment necessary to perform the duties of a sworn officer and that discharge was warranted. Cusumano testified that there was a lengthy process whereby DNR and labor specialists in the Department of Central Management Services (CMS) worked on several drafts of the disciplinary charges.

On March 4, 2010, Plaintiff was given a notice of a pre-disciplinary hearing to be held on March 12, 2010. A statement of charges was attached which listed numerous charges against her. Plaintiff filed a charge of discrimination with the Equal Employment

Opportunity Commission on March 1, 2010. It is undisputed that DNR did not receive the charge of discrimination until March 8, 2010. This was four days after Plaintiff received notice of the pre-disciplinary hearing and the charges against her. Gutierrez made the recommendation to Director Miller that Plaintiff be discharged. On April 23, 2010, Plaintiff was notified of her suspension pending discharge. Robb Craddock, the designee for the Director of CMS, made the final determination to bring the charges for the termination of Plaintiff's employment from DNR. On April 29, 2010, the union representing Plaintiff filed a grievance.[6] Plaintiff was discharged on May 21, 2010.

An arbitration hearing was held on April 1, 2011. Plaintiff participated in the hearing and presented evidence. The arbitrator, who was mutually chosen by the union and management and is not a state employee, upheld the decision to terminate Plaintiff's employment. As noted previously, the arbitrator found there was just cause to discharge Plaintiff.

PROCEDURAL HISTORY

Plaintiff filed her Complaint (#1) against Defendants on March 10, 2011. Plaintiff claimed that she was discriminated against on the basis of her sex in violation of Title VII and on the basis of a perceived disability in violation of the Americans with Disabilities Act (ADA). Plaintiff also claimed that she was retaliated against for filing her EEOC

---

[6] It is undisputed that management offered Plaintiff a 20-day suspension rather than discharge but she and her union rejected this offer. Plaintiff insists that this fact is immaterial because settlement negotiations are inadmissible.

charge and for engaging in speech protected by the First Amendment. Plaintiff further alleged that Defendants' actions violated her equal protection right to be free from discrimination. Finally, Plaintiff alleged that Defendants engaged in a conspiracy which caused her to be denied her constitutional right to due process. On September 23, 2011, Plaintiff received a Notice of Right to Sue from the EEOC.[7]

On July 27, 2011, a Discovery Order (#16) was entered, which was extended several times. The case was assigned to this court on December 11, 2013. On December 17, 2013, Magistrate Judge David G. Bernthal granted, in part, a Motion for Extension of Time to Complete Discovery (#29). Judge Bernthal extended the discovery deadline to February 3, 2014, and the case dispositive motion deadline to March 3, 2014. On February 3, 2014, Judge Bernthal extended the discovery deadline to February 14, 2014 and the dispositive motion deadline to March 17, 2014.

On March 17, 2014, Defendants filed their Motion for Summary Judgment (#34), with attached Exhibits, additional Exhibits (#33, #35, #36, #37), and a Memorandum of Law in Support (#38). Also on March 17, 2014, Plaintiff filed a Motion to Compel Discovery (#31). Plaintiff stated that, due to scheduling conflicts with Defendants' Rule 30(b)(6) witness and Defendants' attorneys, the parties agreed that the deposition of the 30(b)(6) witness would proceed on February 26, 2014. Plaintiff stated that Defendants

---

[7] It is unusual for a complaint to be filed *before* receiving the Notice of Right to Sue. However, Plaintiff has shown that she received the Notice, so her complaint is not subject to dismissal on this basis.

produced two 30(b)(6) witnesses on February 26, 2014, Will Bradley and Michele Cusumano. Plaintiff stated that, during Bradley's deposition, she learned for the first time that the employee discipline logs provided by Defendants, designated as Exhibits 140 and 141, did not include all of the information regarding the discipline of the conservation police officers (CPOs). Plaintiff stated that "[i]n order for Plaintiff to adequately compare her conduct to that of her colleagues, Plaintiff requires the disclosure of *all* of the rules that each CPO listed in Exhibits 140 and 141 could have violated." Plaintiff stated that this meant, according to Bradley, that Plaintiff must inspect the underlying documents that formed the basis for each of the disciplinary actions listed in the logs. Plaintiff stated that she wrote to Defendants and requested the production of underlying records. Plaintiff stated that Defendants refused to produce the documents, stating that the request was "untimely" because it was filed after the close of discovery. Defendants said they would not be producing any documents following the drafting of their Motion for Summary Judgment which was due on March 17, 2014. Plaintiff asked this court to enter an order "compelling Defendants to produce the documents forming the basis of the discipline for each of the listed CPOs in Exhibits 140 and 141 as well as any other discipline each of the *listed* CPOs were issued prior to 2000."

On March 25, 2014, Defendants filed their Response to Plaintiff's Motion to Compel (#41). Defendants stated that Plaintiff was seeking an order compelling Defendants to produce documents which were never the subject of a Request for

Production under Rule 34 of the Federal Rules of Civil Procedure and were merely informally requested in a letter first sent to counsel for Defendants three weeks after the close of discovery in this case. Defendants noted that the discovery deadline in this case (after numerous extensions) was February 14, 2014. Defendants stated that, on January 17, 2014, Plaintiff sent a letter requesting discipline logs for all CPOs. This was less than one month before the final close of discovery, even though Plaintiff had over two and one half years of discovery in which to seek the information. Defendants stated that, despite the informal notice of the request and the fact that discovery would close before any response would be due under Rule 34, Defendants provided Plaintiff with the logs. Defendants also stated that they agreed to complete the 30(b)(6) depositions after the close of discovery, but did not agree to engage in any other discovery after the discovery deadline. Defendants argued that it would be prejudicial to them to allow Plaintiff to seek new discovery after Defendants had filed their Motion for Summary Judgment.

This court entered an Opinion (#31) on March 31, 2014. This court stated that it could not improve much on Defendants' arguments, all of which were well taken. This court concluded that, if Plaintiff did not have all of the discovery she would like, it was solely because of her own delays in requesting discovery she knew all along was necessary. This court then concluded that Plaintiff's Motion to Compel must be denied because it was filed after the close of discovery and must be considered untimely.

On April 24, 2014, Plaintiff filed a Response to Motion for Summary Judgment

(#46) with attached exhibits. Plaintiff also filed a Motion to Strike Paragraphs of Gutierrez's Affidavit (#45). Plaintiff argued that the challenged statements in Gutierrez's affidavit were self-serving, were not supported by evidence of record, and discussed facts and documents that Plaintiff sought in her motion to compel. Plaintiff contended that "[s]urely, allowing Defendants to rely on an affidavit that is based almost entirely without factual support, and which may have had support by the very documents Plaintiff herself was seeking in her motion to compel, is inequitable and unjust." On May 8, 2014, Defendants filed a Memorandum in Response to Plaintiff's Motion to Strike (#48). On May 14, 2014, this court entered an Opinion (#49). This court denied the Motion to Strike, noting that motions to strike are disfavored and Plaintiff failed to include a memorandum of law in support of her motion. This court also concluded that Plaintiff's arguments failed on the merits. This court concluded that the evidence contained in Gutierrez's affidavit would be admissible if he were testifying directly and may be considered by this court. As far as Plaintiff's claim that allowing the affidavit was "inequitable and unjust," this court stated:

> This court denied the motion to compel, not because the subject matter
> of the documents sought was not relevant or discoverable, but because
> the documents were sought much too late in the process. Therefore,
> Gutierrez's statements in his affidavit, signed under oath, may be
> considered by this court even though Plaintiff has not had the

opportunity to review documents which may relate to the same subject matter.

On May 23, 2014, Defendants filed their Reply (#51). On June 9, 2014, this court entered a text order and directed the parties to provide documents which were referred to in support of and in opposition to the Motion for Summary Judgment but which had not been provided to the court. On June 11, 2014, the parties complied with this court's order (#52, #53). The Motion for Summary Judgment is now fully briefed and ready for ruling.

ANALYSIS

SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). However, a court's favor toward the nonmoving party does not extend to drawing "[i]nferences that are supported by only speculation or

conjecture." *See Singer*, 593 F.3d at 533, *quoting Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008).

The party opposing summary judgment may not rely on the allegations contained in the pleadings. *Waldridge*, 24 F.3d at 920. "[I]nstead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004), *quoting Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Specifically, to survive summary judgment, "the nonmoving party must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007)

## PLAINTIFF'S CLAIMS[8]

### I. SEX DISCRIMINATION

Plaintiff has alleged that her rights under Title VII were violated when she was terminated from employment with DNR because her gender played a role in the decision. Defendants claim that they are entitled to summary judgment on this claim because

---

[8] This court notes that Defendants have argued that Plaintiff has no evidence to support her conspiracy theory and must show that each Defendant was personally involved in the conduct which forms the basis of her claims. Because this court concludes that none of Plaintiff's claims have merit, it has not considered or discussed each individual Defendant's involvement or lack thereof.

Plaintiff does not have evidence to prove her discrimination claim.

Under current law, there are two ways a plaintiff may prove her claim, the "direct" and "indirect" methods of proof. *Perez v. Thorntons, Inc.*, 731 F.3d 699, 703 (7th Cir. 2013). However, "when all is said and done, the fundamental question at the summary judgment stage is simply whether a reasonable jury could find prohibited discrimination." *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014). Under the direct method, "[a] plaintiff can survive summary judgment by producing either" circumstantial or direct evidence, "as long as it creates a triable issue on whether the discrimination motivated the employment action." *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011). A plaintiff must offer something akin to an admission by the defendant or "construct a convincing mosaic" of proof that will allow a jury to infer intentional discrimination. *Perez*, 731 F.3d at 710.

Plaintiff has argued that, under the direct method, she has submitted a wealth of circumstantial evidence to defeat summary judgment. Plaintiff argues that she has evidence that male conservation police officers engaged in similar or more egregious conduct but were not subject to investigatory interviews as she was, were not disciplined at all or as harshly as she was, were not progressively disciplined as she was and did not have violations stacked up against them. Plaintiff also argued that the evidence that Pitchford sent a confidential fax to Gutierrez regarding Plaintiff's claim of sexual harassment in 2000 shows that it played a role in the investigation and discipline. In

addition, Plaintiff contends that there is evidence of suspicious timing, since Pitchford's fax was sent within a month of her being placed on administrative leave. Plaintiff has also pointed out that she has presented evidence that she performed her job very well since she received letters of commendation shortly before, during and after her administrative leave in 2009.

This court concludes that Plaintiff has "presented no—literally no—evidence that her firing was for a prohibited reason." *See Bass,* 746 F.3d at 840-41. Obviously, Plaintiff performed her job well on many occasions, she was employed as a conservation police officer for approximately 23 years. That does not mean that she was a victim of discrimination when discipline was imposed for occasions when there were serious problems with her work performance. *See, e.g., Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014) (fact that employee satisfied employer's expectations at some point did not mean she met the employer's expectations at the time she was fired). This court also finds no suspicious timing. The investigation against her had already begun before Pitchford sent the fax to Gutierrez. Pitchford reasonably provided information to Gutierrez about the previous unfounded claim of sexual harassment while he was conducting the investigation and Gutierrez determined that, because of the length of time and the fact that the claim was unfounded, there was no problem with Pitchford conducting the investigation.

There are numerous problems with Plaintiff's claim that she has presented

evidence that male conservation police officers were treated more favorably, thus showing that Plaintiff was discriminated against on the basis of her sex. First, she has relied for the most part on Exhibit 140, a discipline log listing the name of the employee, the infraction and the discipline imposed, if any. Defendants have correctly pointed out that Plaintiff, in her Motion to Compel, acknowledged that Exhibit 140 does not provide an accurate basis for comparison because it does not include all of the information regarding the discipline of the conservation police officers. William Bradley testified that there is no way to tell whether, as to any given incident, the discipline was what the Department sought or what was imposed after a grievance.[9] Also, there is no way to tell why a given level of discipline was imposed. Bradley testified that Exhibit 140 is merely used as a guide for staff to tell them when to go look at the underlying files. In some cases, charges are included in the log even though the evidence did not sustain one or all of the charges. Plaintiff has not presented any evidence which contradicts Bradley's testimony and, in fact, argued that she needed the underlying documents because of Bradley's testimony. Plaintiff asked for the underlying documents too late, after the close of discovery, and this court concludes that Exhibit 140 does not include competent evidence to support Plaintiff's argument that male conservation police officers were treated more favorably.

---

[9] Although Plaintiff has argued that the fact that, during the grievance process, she was offered a 20 day suspension rather than discharge is inadmissible evidence, this fact demonstrates that the grievance process can result in much less serious discipline than what was originally sought by DNR.

Plaintiff has also relied on her own testimony regarding misconduct by other officers and the discipline imposed. Much of this testimony was not based on Plaintiff's personal knowledge but was instead based on hearsay or rumor. This clearly is not evidence from which a trier of fact could find that male officers were treated more favorably. In addition, in his affidavit, Gutierrez stated that he was not aware of any situation which fit the descriptions Plaintiff provided.

This court therefore concludes that Plaintiff's evidence fails under the direct method because "the record contains neither explicit declarations of a discriminatory motive nor sufficient circumstantial evidence for a jury to infer discrimination." *See Garofalo v. Vill. of Hazel Crest*, ___ F.3d ___, 2014 WL 2609895, at *9 (7th Cir. 2014), *quoting Zayas*, 740 F.3d at 1157.

Plaintiff also contends that she can defeat summary judgment based upon the indirect method of proof. Under this method, Plaintiff must establish a prima facie case by "demonstrating that (1) she is a member of a protected class; (2) she met her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class received more favorable treatment." *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012).

Defendants have focused on the fourth element of the prima facie case and contend that Plaintiff cannot identify a similarly situated male employee who engaged in the same behavior and was treated more favorably. *See Zayas*, 740 F.3d at 1158. A similarly

situated employee must be "directly comparable" to Plaintiff "in all material respects." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 981 (7th Cir. 2014), *quoting Abuelyaman v. Ill. State Univ.*, 667 F.3d 800, 810 (7th Cir. 2011). The court must consider "all relevant factors in making this determination, including whether the similarly situated employee held the same position, had the same supervisor, was subject to the same standards, and engaged in similar conduct." *Alexander*, 739 F.3d at 981. "The purpose of the inquiry is to eliminate other possible explanatory variables, such as differing rules, performance histories, or decisionmaking personnel, which helps isolate the critical independent variable–discriminatory animus." *Perez*, 731 F.3d at 704, *quoting Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (internal quotations omitted). This is a "common-sense" analysis, however, and "not an . . . inflexible requirement that requires near one-to-one mapping between employees." *Alexander*, 739 F.3d at 981, *quoting Humphreys v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007). Plaintiff has correctly pointed out that courts are looking for comparators, not "clone[s]." *Coleman*, 667 F.3d at 846, *quoting Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 916 (7th Cir. 2010).

This court agrees with Defendants that Plaintiff cannot point to a comparator who was similarly situated and treated better than Plaintiff. As noted previously, Exhibit 140 simply does not provide sufficient information to allow a comparison of the listed employees, mainly because it does not include information regarding the exact nature of the employees' conduct or the decision maker. Plaintiff has argued that, in this case,

whether a comparator worked for the same supervisor is unimportant because, under the collective bargaining agreement between the conservation police officers and management, "equitable treatment of the covered employees" was stressed. Plaintiff has cited no case law in support of this argument, and this court concludes that the same standard applies whether or not there is a collective bargaining agreement. *See Cohen-Chaney v. Nat'l R.R. Passenger Corp.*, 2012 WL 243676, at *8 (S.D. Ind. 2012) (mere fact that employees are subject to the same collective bargaining agreement does not make them similarly situated); *Riley v. Nat'l R.R. Passenger Corp.*, 2004 WL 2533724, at *5 (N.D. Ill. 2004) (employees not similarly situated based simply on a shared collective bargaining agreement).

Under the appropriate standard, Plaintiff must identify another employee who engaged in similar conduct but was treated more favorably by the same decision maker. *See Riley*, 2004 WL 2533724, at *5. This court concludes that Exhibit 140 and Plaintiff's hearsay testimony cannot be considered in determining whether a similarly situated male employee was treated more favorably than Plaintiff. Plaintiff has, however, pointed to Warren as a comparator. Plaintiff argued that Warren was not disciplined for his failure to issue the August 2008 citations which were found in Plaintiff's DNR truck in April 2009. This court agrees with Defendants that Warren was not similarly situated. Warren did not leave the citations in his truck after agreeing to process them. Warren could only be faulted for not following up with Plaintiff, who had possession of the citations until

January 26, 2009, and did not do what she agreed to do. This court additionally notes that Plaintiff's attempt to compare herself to Warren, and other officers she has argued were similarly situated, fails for another reason. Plaintiff has listed other officers who engaged in an act similar to one of the acts of misconduct she was determined to have engaged in, such as conduct unbecoming an officer, and argued that the other officers were treated more favorably. However, Plaintiff must show that any comparable officer had a "comparable set of failings." *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 310, *quoting Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 530 (7th Cir. 2003).[10] This court also concludes that Plaintiff's broad assertions that other officers were treated more favorably and did not have charges "stacked" against them, with no competent evidence from which this court can make a reasoned comparison to determine whether other possible explanatory variables could account for any differences in treatment, are not sufficient to satisfy the fourth prong of her prima facie case. *See Zayas*, 740 F.3d at 1158.

Because this court has concluded that Plaintiff has not presented sufficient evidence under the direct or indirect method of proof, Defendants are entitled to summary judgment on Plaintiff's sex discrimination claim.

## II. DISCRIMINATION BASED UPON PERCEIVED DISABILITY

Plaintiff claims that Defendants discriminated against her based upon a perceived

---

[10] This court notes that, of all the officers Plaintiff has listed, the only one who comes close to being similar is Robert Austin. Austin also engaged in a list of misconduct over a period of time and ultimately resigned. Gutierrez testified that Austin was disciplined for violations and then committed other violations, which eventually led to his termination or his resignation.

disability, in violation of the ADA. Plaintiff claims that Defendants' actions in requiring Plaintiff to submit to fitness for duty exams show that they perceived her to have an impairment that substantially limited a major life activity, the ability to work. Defendants have argued that they are entitled to summary judgment on this claim, mainly arguing that Plaintiff has not shown that she suffered an adverse employment action.

To establish disability discrimination, Plaintiff must show that she is disabled within the meaning of the ADA, that she is qualified to perform the essential functions of the job, either with or without a reasonable accommodation, and that she suffered from an adverse employment action because of her disability. *See Nese v. Julian Nordic Constr. Co.*, 405 F.3d 638, 641 (7th Cir. 2005); *see also Bunn v. Khoury Enter., Inc.*, ___ F.3d ___, 2014 WL 2198557, at *5-6 (7th Cir. 2014). In order to establish that she is disabled, Plaintiff can show either (1) that she has a physical or mental impairment that substantially limits her in one or more major life activities; (2) that she has a record of such an impairment; or (3) that her employer regarded her as having such an impairment. *Nese*, 405 F.3d at 641. In order to prevail under a "regarded as" theory, Plaintiff must demonstrate that (1) the employer mistakenly believed that the employee has an impairment that substantially limits a major life activity, or (2) the employer mistakenly believed that an existing impairment, which is not actually limiting, does substantially limit a major life activity. *Bunker v Schwan's Home Serv., Inc.*, 583 F.3d 1004, 1008 (7th Cir. 2009), *citing Nese*, 405 F.3d at 641.

Plaintiff has argued that DNR admitted that it regarded her as disabled and unable to work when it told her that she could go on disability leave after Dr. Detrick determined she was not fit to return to unrestricted duty. Plaintiff argued that Defendants' actions show that DNR mistakenly believed that Plaintiff had an impairment that substantially limited the major life activity of working. Plaintiff argued that, at that time, she was placed on unpaid leave, which was an adverse employment action.

This court agrees with Defendants that, even if Plaintiff could show that DNR regarded her as having a disability, Plaintiff cannot show that she suffered an adverse employment action because of a perceived disability. Plaintiff was placed on paid leave on January 26, 2009, based upon her escalation of the parking conflict with the Parkers. On April 29, 2009, after Dr. Detrick's evaluation, Cusumano sent Plaintiff a letter which stated that she would no longer be on administrative leave with pay. The letter stated that Plaintiff would be able to use accumulated sick leave and, upon depletion of her available sick leave, she could apply for a "Disability/Non-service Connected" leave of absence. On July 2, 2009, Cusumano sent Plaintiff another letter. Cusumano stated that she had received Plaintiff's evaluator's statement, dated June 15, 2009, stating that Plaintiff was fit for duty. Cusumano stated that, as of June 16, 2009, Plaintiff would be placed on administrative leave with pay, pending the outcome of a follow-up examination with an independent medical provider. So, Plaintiff's claim is that she suffered an adverse employment action because she was on unpaid leave from April 29, 2009 to June 16,

2009, a period of about 1 and ½ months. However, Defendants have provided evidence that Plaintiff was paid during that time and, following a grievance, all benefits were restored to her so that any benefit time she used during her leave was reinstated.

Plaintiff has to show that she suffered an adverse employment action, whether she is proceeding under the direct or indirect method of proof on her ADA claim. *See Bunn*, 2014 WL 2198557, at *5-6. In order to show an adverse employment action, Plaintiff must show "some quantitative or qualitative change in the terms and conditions of [her] employment or some sort of real harm." *See Chaib v. Indiana*, 744 F.3d 974, 982 (7th Cir. 2014), *quoting Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1116 (7th Cir. 2009). Adverse employment actions can include termination of employment, demotion with a decrease in salary, a less distinguished title, a material loss of benefits, and significantly diminished material responsibilities. *Porter v. City of Chicago*, 700 F.3d 944, 954 (7th Cir. 2012). This court concludes that Plaintiff has not shown that she suffered an adverse employment action when she was put on unpaid leave for a short period of time.[11] The record shows that she was actually paid for this time and any benefit time she used during this leave time was reinstated when her benefits were restored, so there were no adverse consequences to her. This court notes that Plaintiff has not argued that she was discharged

---

[11] This court agrees with Defendants that, to the extent Plaintiff may be trying to argue that she suffered an adverse employment action because she was not returned to work on some kind of restricted duty, there is no evidence that she could perform the essential functions of her job consistent with Dr. Detrick's finding that she could not return to unrestricted duty. Plaintiff has provided no evidence that there was a restricted duty position she could have performed, with or without accommodation.

because of her alleged perceived disability.[12] Because Plaintiff has not shown that she

suffered an adverse employment action based upon her alleged perceived disability,

Defendants are entitled to summary judgment on this claim.

## III. TITLE VII RETALIATION

In her Complaint (#1), Plaintiff claimed that she was retaliated against for filing a

charge of discrimination with the EEOC. Plaintiff did not respond to Defendants' Motion

for Summary Judgment as to this claim, and this court agrees with Defendants that

Plaintiff has abandoned this claim.[13] However, in her Response, Plaintiff now claims that

she was retaliated against because of her claim of sexual harassment in 2000. In their

Motion for Summary Judgment, Defendants have argued that Plaintiff has no evidence to

support this claim, noting in particular that Plaintiff has no proof of causation. In

response, Plaintiff contends that "Pitchford never forgot" about her 2000 statement or

allegations. She argues that this is shown by the fact that he faxed a document related to

Plaintiff's 2000 claim of sexual harassment to Gutierrez shortly after she was placed on

---

[12] This court also agrees with Defendants that Plaintiff could not make the necessary showing under the ADA. A plaintiff complaining of discriminatory discharge under the ADA must show that her employer would not have fired her but for her actual or perceived disability, proof of mixed motives will not suffice. *Serwatka v. Rockwell Automotive, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010). Based on this record, there is no evidence which could support a finding that Plaintiff was discharged because of a perceived disability.

[13] This court also agrees with Defendants that this claim has absolutely no merit. Plaintiff would have to show that Defendants retaliated against her for filing her EEOC charge. There is no evidence to support such a claim because Plaintiff was given a notice of a pre-disciplinary hearing, with a long list of the charges against her, *before* Defendants received notice of Plaintiff's EEOC charge.

administrative leave. Plaintiff argues that "[o]ne can only conclude that Pitchford's actions were in response to [Plaintiff's] 2000 complaint." This court does not agree.

To succeed on her retaliation claim, Plaintiff must establish that her protected activity "was a but-for cause of the alleged adverse action by the employer." *Univ. of Texas S. W. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013); *Hnin v. TOA (USA), LLC*, ___ F.3d ___, 2014 WL 1758457, at *7 (7th Cir. 2014). Plaintiff's argument does not make clear what adverse employment action she is claiming. However, in her Response to Defendants' interrogatories, Plaintiff stated that Defendants should have known that it was improper to assign Pitchford to supervise her or conduct the investigation of any citizen complaint knowing the history of her complaint of sexual discrimination against him. She stated that, "[a]s a result, the investigations stemming from the Parkers and thereafter were retaliatory." This court agrees with Defendants that this claim fails for multiple reasons.[14]

First of all, Plaintiff has cited no authority for the proposition that it is retaliation when an employee is supervised or investigated by a supervisor who was the subject of a sexual harassment claim found to be unfounded. Defendants have persuasively argued that, if that were the case, an employee could avoid being supervised or investigated by a particular person by making an unfounded claim of sexual harassment against that person.

---

[14] This court notes that Defendants have persuasively argued that Plaintiff did not oppose a practice prohibited by Title VII when she made an unfounded sexual harassment claim. However, because this court concludes that there is no evidence to support retaliation in any case, there is no need to address this point.

This court agrees with Defendants that the applicable law does not support such a proposition. Second, while Plaintiff has complained bitterly about Pitchford being assigned to the investigation, there is no evidence to support a claim of retaliation. According to Gutierrez, when a serious policy violation involving a conservation police office is investigated and more than a counseling is being considered, the DNR Office of Law Enforcement has a policy that a region commander, rather than a first line supervisor, conducts the investigation. Pitchford was Plaintiff's Region Commander. Although Plaintiff has claimed that her problems with Pitchford continued after she claimed sexual harassment in 2000, there is absolutely no evidence of that. When Pitchford was Plaintiff's supervisor, he gave her good evaluations. Most importantly, Plaintiff has not identified any inaccuracies in Pitchford's investigations. In fact, Plaintiff has admitted most of the conduct which was the subject of Pitchford's investigations. Plaintiff has instead argued that, for various reasons, her conduct should not have resulted in discipline. Pitchford was not the decision maker for the discipline imposed. This court additionally notes that Plaintiff's unfounded claim of sexual harassment, made in 2000, was too far removed from the investigation leading to her termination in 2009 to show any kind of retaliation. *See Haywood*, 323 F.3d at 532 (one year time period far too long to allow a reasonable fact-finder to infer that her termination was causally related to the filing of her complaint); *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918-19 (7th Cir. 2000) (facts insufficient to show retaliation where there was a three-month gap between

the filing of EEOC claim and date of recall decisions and no evidence connecting the two); *Jenkins v. Shinseki,* 641 F. Supp. 2d 754, 765 (C.D. Ill. 2009) (the plaintiff's conduct in 2003 too far removed from employer's actions in 2006 to support a claim of retaliation).

Defendants are clearly entitled to summary judgment on this claim.

IV. RETALIATION FOR EXERCISE OF FIRST AMENDMENT RIGHTS

Plaintiff has also claimed that she was retaliated against in violation of her First Amendment rights. Plaintiff has stated that she is relying on the evidence that, on September 25, 2008, she and Warren met with Pitchford and informed Pitchford that Bill Cottrell, a conservation police officer, was often seen at his farm in Danville, Illinois, when he was supposed to be working his assigned shift, which sometimes involved a DUI assignment. She claims that her "speech was made in her capacity as a private citizen when she and CPO Warren met with Sgt. Pitchford in September 2008 to address issues of officer safety and ethics with him." Plaintiff has argued that her protected speech in September 2008 was a motivating factor in her being placed on administrative leave in January 2009.

Defendants have argued that they are entitled to summary judgment on this claim because Plaintiff has not shown that any Defendant other than Pitchford knew of the speech and cannot show a causal connection between her speech and any adverse employment action. Defendants have also disputed whether Plaintiff's speech was

protected.

"To establish a claim for retaliation in violation of the First Amendment, a public employee must prove that: (1) his speech was constitutionally protected, (2) he has suffered a deprivation likely to deter speech, and (3) his speech was at least a motivating factor in the employer's action." *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013). This court concludes, based upon the evidence provided to the court in this case, that there is absolutely no evidence of a causal connection between Plaintiff's speech and any adverse employment action. In addition, it is clear that Plaintiff's speech was not protected.

"For a public employee's speech to be protected under the First Amendment, the employee must show that (1) he made the speech as a private citizen, (2) the speech addressed a matter of public concern, and (3) his interest in expressing that speech was not outweighed by the state's interests as an employer in 'promoting effective and efficient public service.'" *Swetlik*, 738 F.3d at 825, *quoting Houskins v. Sheahan*, 549 F.3d 480, 490 (7th Cir. 2008). Since the United States Supreme Court's decision in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), it is well settled that a public employee's statements made pursuant to official duties are not made as a private citizen for the purposes of the First Amendment. *Garcetti*, 547 U.S. at 421-22. The Seventh Circuit has explained that *Garcetti* stands for the proposition that "public employees speaking 'pursuant to their official duties' are speaking as employees, not citizens, and thus are not

protected by the First Amendment regardless of the content of their speech." *Hernandez v. Cook County Sheriff's Office*, 634 F.3d 906, 914-15 (7th Cir. 2011), *quoting Spiegla v. Hull (Spiegla II)*, 481 F.3d 961, 965 (7th Cir. 2007).

In *Spiegla*, the plaintiff, a state correctional officer, reported a possible breach of security to her superiors and was reassigned four days later to a less desirable job at the Correctional Center. The Seventh Circuit held in *Spiegla I* that her speech was protected by the First Amendment. *Spiegla v. Hull*, 371 F.3d 928, 939 (7th Cir. 2004). Following remand, a jury trial was held and the jury found for the plaintiff and awarded $210,000 in damages. The defendants appealed and, after briefing was completed, the Supreme Court issued its decision in *Garcetti*. The Seventh Circuit granted the defendants' request for supplemental briefing in light of *Garcetti*. *Spiegla II*, 481 F.3d at 963.

In applying *Garcetti*, the court stated that, if the plaintiff's statements "were made pursuant to her official duties as a correctional officer, it was not protected speech and she has no claim for First Amendment retaliation." *Spiegla II*, 481 F.3d at 964. The Seventh Circuit then reversed the jury's verdict based on *Garcetti* and remanded the case to the district court with instructions to enter judgment for the defendants. *Spiegla II*, 481 F.3d at 967. The court concluded that the plaintiff "acted as a government employee" when she reported the possible misconduct to her superior and sought clarification of a security policy she felt may have been breached. *Spiegla II*, 481 F.3d at 967. The court explained:

> She did not make a public statement, discuss politics with a coworker,
> write a letter to newspapers or legislators, or otherwise speak as a
> citizen. [Citation omitted]. Because [the plaintiff] did not speak as a
> citizen under the standard articulated in *Garcetti*, she has no claim for
> First Amendment retaliation under § 1983.

*Spiegla II*, 481 F.3d at 967.

This court must reach the same conclusion in this case. Plaintiff and Warren met with Pitchford as employees of DNR and reported concerns they had regarding another conservation police officer, Cottrell. This falls squarely under *Garcetti*. This court notes that, in support of her First Amendment claim, Plaintiff cited *Spiegla I, Renken v. Gregory*, 541 F.3d 769 (7th Cir. 2008) and *Shefcik v. Vill. of Calumet Park*, 532 F. Supp. 2d 965 (N.D. Ill. 2007). *Spiegla I* is of course no longer good law following *Garcetti* and neither *Renken* nor *Shefcik* provide any support for Plaintiff's argument that she spoke as a private citizen. In *Renken*, the Seventh Circuit concluded that the plaintiff's complaints about the University's proposed use of grant funds money fell within the scope of his teaching duties at the University. *Renken*, 541 F.3d at 773-74. Because the plaintiff complained to his supervisors about matters relating to his job, his speech was not protected. *Renken*, 541 F.3d at 774-75. The same is true here. In *Shefcik*, the plaintiff spoke in his capacity as a union representative. In finding that some of the plaintiff's speech was protected by the First Amendment, the court concluded that "a public

employee who makes a statement in his capacity as a union representative is speaking as a citizen, not as an employee." *Shefcik*, 532 F. Supp. 2d at 974. *Shefcik* is inapposite because Plaintiff has not, and cannot, claim that she and Warren were speaking as union representatives when they talked to Pitchford about Cottrell.

For all of the reasons stated, Defendants are entitled to summary judgment on Plaintiff's First Amendment retaliation claim.

## V. EQUAL PROTECTION

Plaintiff's Complaint included claims that Defendants violated her constitutional right to equal protection because "Defendants treated Plaintiff unequally and differently from other similarly-situated individuals." Defendants have argued that Plaintiff's claim fails for lack of evidence and they are therefore entitled to summary judgment on this claim. In response, Plaintiff insists that her claim should survive because there was no rational basis for Defendants' discrimination against her.

This court has already concluded that Plaintiff has not shown that similarly situated individuals were treated more favorably. The examples Plaintiff has cited in this section of her argument are based upon Exhibit 140 and Plaintiff's testimony about other officers' actions which was not based upon personal knowledge but was instead based on hearsay or rumor. This court concludes that Plaintiff has presented no admissible evidence from which a reasonable jury could find that Defendants treated Plaintiff differently from similarly situated individuals without a rational reason. Defendants are

entitled to summary judgment on this claim.

## VI. DUE PROCESS

In her Complaint (#1), Plaintiff claimed that Defendants violated her constitutional right to due process because they "agreed and conspired to have Plaintiff investigated on trumped up violations of the Department of Natural Resources' rules and regulations because of Plaintiff's sex and disability and in violation of her right to due process of law." Plaintiff also alleged that Defendants "agreed and conspired to create false and illegitimate reasons for disciplining Plaintiff, up to and including termination, and to deny her the right to a full and fair hearing by fabricating matters to substantiate Plaintiff's discipline and termination." Plaintiff alleged that "[s]aid conspiracy or conspiracies and overt acts proximately caused Plaintiff to be denied her right to due process under the Fourteenth Amendment."

Plaintiff is correct that due process primarily requires a fair proceeding with procedural safeguards which require both proper notice and an opportunity to be heard. *Ciechon v. City of Chicago*, 686 F.2d 511, 517 (7th Cir. 1982). Defendants have argued that they are entitled to summary judgment on this claim because both the pre-termination and post-termination proceedings, including arbitration, provided Plaintiff with notice and an opportunity to be heard. Defendants have also argued that Plaintiff has no evidence of a conspiracy, noting that the fact that there is concerted action among people with different responsibilities who are expected to work together, like supervisors and human

resources staff, is not evidence of a conspiracy. *See Smith v. Bray*, 681 F.3d 888, 905 (7th Cir. 2012). In her Response, Plaintiff has set out many theories regarding how matters were handled to her detriment. She argued that "the evidence shows that the charges, investigations and subsequent investigatory interviews" were "nothing but mere pretense." Plaintiff also argued that the proceedings were not conducted in a timely fashion, in violation of DNR's own policy. Plaintiff argued that Defendants delayed disciplining her so they could stack the charges against her. Plaintiff also argued that there is a genuine issue of material fact regarding the existence of a conspiracy. Plaintiff argued that the "long litany of misconduct by Defendants against [her] represents a well-orchestrated plan led by Pitchford to wrongfully terminate [her]."

This court agrees with Defendants that Plaintiff has not shown a violation of her due process rights. As far as pre-termination proceedings, Plaintiff testified that, during the investigatory interviews, she was "given an opportunity to fully explain [her] position." As far as post-termination proceedings, Plaintiff has not claimed any defects in the grievance process or the arbitration proceedings. Plaintiff has claimed that the discharge proceedings were not conducted in a timely manner, in violation of DNR's policy. However, the arbitrator rejected this argument and determined that there was no undue delay "based on the circumstances of this particular case." The arbitrator noted that the investigations were complete in November 2009 and a pre-disciplinary meeting was scheduled for March 12, 2009, roughly four months later. The arbitrator stated:

> If this were a simple case or a disciplinary matter involving a single
>
> act of misconduct, I would agree that there was undue delay. But in
>
> this case, given the number of charges and the large volume of
>
> information that had to be reviewed, it must be concluded that four
>
> months was not an unreasonable period of time.

The arbitrator also concluded that no prejudice was shown to have been caused by the length of time involved because there was no evidence that Plaintiff was "deprived of an early opportunity to investigate, gather evidence, prepare a defense, or find competent witnesses." This court likewise concludes that Plaintiff's due process rights were not violated because of the length of time involved in the disciplinary process.

This court also agrees that Plaintiff has presented no evidence of a conspiracy between any of the Defendants. Accepting Plaintiff's argument that there was a "long litany of misconduct" by Defendants would require a trier of fact to find that Pitchford had a motive to get Plaintiff discharged, even though he had previously supervised her for years and gave her good evaluations, and the other Defendants joined in, for no apparent reason. Plaintiff has presented much speculation but no evidence which could support a finding of such a conspiracy.

The evidence, instead, shows that Plaintiff escalated a simple parking dispute with her neighbors which, because the dispute involved her DNR truck, reflected poorly on DNR and cast serious doubt on her judgment. From there, her supervisors discovered that

many other aspects of her performance were questionable. This ultimately led to her

discharge, with various Defendants involved at times as part of the chain-of-command.

This court concludes that there is no genuine dispute over any material fact and

Defendants are entitled to summary judgment on this claim.

IT IS THEREFORE ORDERED THAT:

(1) Defendants' Motion for Summary Judgment (#34) is GRANTED. Judgment is

entered in favor of Defendants and against Plaintiff on all of Plaintiff's claims.

(2) This case is terminated.

ENTERED this 30th day of June , 2014.


s/COLIN S. BRUCE
U.S. DISTRICT JUDGE